UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J.LBR 9004-1(b)

Donald F. Campbell, Jr. (DC8924)
Giordano, Halleran & Ciesla, P.C.
125 Half Mile Road, Suite 300
Red Bank, NJ 07701
Tel: 732 741 3900
Fax: 732 224 6599
dcampbell@ghclaw.com
Attorneys for Raymond Dietrich and Air
Technical Home Services LLC d/b/a Air
Technical Services

In Re:

CAROLYN E. BROWN

Case No: 20-20921

Chapter:7

Hearing Date: April 30, 2021

Judge: Hon. Christine M. Gravelle

## CERTIFICATION OF RAYMOND DIETRICH
## IN SUPPORT OF THE CHAPTER 7 TRUSTEE'S MOTION FOR AN ORDER
## APPROVING STIPULATION OF SETTLEMENT AND IN RESPONSE TO THE
## CERTIFICATION OF DOUGLAS R. BROWN IN OPPOSITION TO SAME

I, Raymond Dietrich, hereby certify as follows:

1. I have an ownership interest in the following businesses: (i) Patterson Ave. Properties,
LLC; (ii) Browns Gas Appliance & Furnace Service; and (iii) Brown's Heating & Cooling, Inc.
(collectively the "Business Interests"). I submit this Certification in support of the Chapter 7
Trustee's Motion for an Order Approving Stipulation of Settlement (the "*Motion*") and in
response to the Certification of Douglas R. Brown in Opposition to same.

2. I have been involved in litigation against Carolyn Brown and Brown's Heating and
Cooling for multiple years which, in part, was a dispute over what percentage of ownership in
the above-referenced businesses.

3.   Upon the appointment of the Chapter 7 Trustee, the Trustee, and I, as the sole shareholders of Brown's Heating & Cooling, Inc. agreed that the Company would retain RACG, LLC to conduct an assessment of the business (the "Report").  It was specifically discussed with Douglas Brown's counsel that the Report would not act as a valuation of the company.

4.   We never received a complete Report due to Douglas Brown's delay and/or failure to provide RACG, LLC with critical information concerning the Company's corporate financial information and documentation.

5.   With regard to the reference of a grand jury matter, this is a mere distraction and completely irrelevant to the issues in dispute.  The issue is a minor incident that did not involve me personally and which I have refuted.  This is nothing more than a desperate attempt to tarnish my reputation and the Court should disregard these allegations.

6.   I have worked with many employees at Brown's Heating & Cooling, Inc. for over 19 years and have a strong connection with these employees and the business's customers. I want nothing more than the company to be a successful business.

7.   Pursuant to the Shareholder Agreement of Brown's Heating & Cooling, Inc., I, as the only remaining living shareholder, am authorized to purchase the Debtor's shares. *See* Shareholder Agreement attached hereto as **Exhibit A**.


I declare under penalty of perjury that the foregoing is true and correct.


Dated:  April 30, 2021

Raymond Dietrich

Docs #4707899-v1

2

# EXHIBIT A

## SHAREHOLDERS AGREEMENT

**AGREEMENT** dated as of *July* / *st*, 2010, between and among

1. **CAROLYN BROWN**, who resides at 1 Channel Drive, Unit #1004, Monmouth Beach, New Jersey 07750 ("CAROLYN").

2. **RAYMOND DIETRICH**, who resides at 1095 Ridge Avenue, Manahawkin, New Jersey 08050 ("RAYMOND").

Collectively, CAROLYN and RAYMOND, are referred to as the "Shareholders" or severally the "Shareholder".

3. **BROWN'S HEATING & COOLING, INC.**, a Delaware corporation, (the "Corporation"), is the parent of Brown's Gas Appliance & Furnace Service, Inc., a wholly owned subsidiary ("Subsidiary"), with its principal place of business at 88 Birch Street, Little Silver, New Jersey 07739.

Collectively, CAROLYN, RAYMOND, and the CORPORATION, are referred to as the "Parties", and individually as Party.

### RECITALS

a. **WHEREAS**, Carolyn has caused the Subsidiary to engage in the trade or business of home heating, ventilation and air conditioning (the "Business").

b. **WHEREAS**, Carolyn (Principal Shareholder) is sole owner of all equity in the Corporation which is engaged in heating, ventilation and air conditioning (the "Business"). The Principal Shareholder desires to have Raymond, who is employed by the Corporation as an at-will employee become a Minority Shareholder in order to facilitate and foster the increased business generation of the Minority Shareholders and to motivate and reward the Minority Shareholders for becoming more active in management aspects of the Business, and the Minority Shareholders are desirous of same.

c. **WHEREAS**, the Parties hereto wish to provide guidelines for the management and operations of the Corporation, and the ownership and transfer of the Shares.

d. **WHEREAS**, the Shareholders wish to promote their mutual interest and the interests of the Corporation by imposing certain restrictions on the transfer of the Shares and on transactions between and among the Parties hereto.

e. **WHEREAS**, the Parties wish to provide for the management of the Corporation and the ownership and transfer of the Shares.

**NOW, THEREFORE, THE PARTIES HERETO, FOR GOOD AND VALUABLE CONSIDERATION, RECEIPT OF WHICH IS HEREBY ACKNOWLEDGED, AGREE TO THE FOLLOWING TERMS AND CONDITIONS**:

**I.    Authorization and Issuance of Shares; Shareholders.**

      1. Authorized Shares.

The aggregate number of Shares which the Corporation shall have authority to issue shall be one class of capital stock consisting of 1000 shares of common stock with $0.01 par value, (the "Common Stock" or "Shares").

      2. Current Share Ownership.

a. The Shareholders acknowledge that, prior to the execution of this Agreement, they each owned the number of Shares of Common Stock, of the class specified below:

| Shareholder Name | Class of Shares | Number of Shares | Comment |
|---|---|---|---|
| Carolyn Brown | Common | 100 | |
| | | | |

b. The Shareholders acknowledge that, upon execution of this Agreement, the Shareholders shall make the required transfers so that following the execution of this Agreement the Shareholders shall own the following Shares:

| Shareholder Name | Class of Shares | Number of Shares | Comment |
|---|---|---|---|
| Carolyn Brown | Common | 600 | |
| Brown's Heating & Cooling, Inc. Management Stock Bonus Plan | Common | 400 | |

c. The Shareholders acknowledge that Raymond is the only person currently eligible for the Plan.

      3. Rights and Characteristics of Shares.

a. Classes of Shares.

There will be one class of Stock.

b. Voting Rights of Shareholders.

(1) The Shares issued outright to SHAREHOLDERS shall be voting Shares; however, shares issued from the Stock Bonus Plan shall be subject to restrictions.

(2) The Shares issued through the Brown's Heating & Cooling Stock Bonus Plan shall, upon issuance, be subject to a Voting Trust pursuant to Del. Gen. Corp. §218 in which Carolyn shall exercise voting rights until all restrictions lapse.

(3) A legend stating such shall appear on each stock certificate issued with respect to such Shares subject to any voting trust imposed by this Agreement.

c. Restrictions on Change in Rights of Shares.

No change shall be made in the characteristics, voting rights, dividend payments, or other attributes of any class of stock unless such change is consented to by a majority of the Shareholders.

4. Shareholders' Meeting.

A Shareholders' meeting shall be held on the First Tuesday of each March of each year at such time and location as the Board of Directors shall give reasonable Notice (as defined below).

5. Limitation on Other Activities.

Except as specifically provided to the contrary in this Agreement, nothing in this Agreement shall be deemed to restrict in any way the freedom of any Shareholder to conduct passive investment activity whatsoever at any location other than the place of Business of the Corporation, so long as such activity does not directly compete with, or conflict with the Business of the Corporation. In the event of any conflict between this provision and any provision governing non-competition below, such non-competition provision shall govern.

## II.    **Control and Management.**

1. Board of Directors.    Carolyn shall serve as the Sole Director of the Corporation.

a. Number of Directors.    The Corporation shall have no fewer than one (1) director.

b. Designation of Directors.

(1) The parties, including the Trustee of the Voting Trust, shall vote their Shares so that the Board of Directors of the Corporation shall at all times include CAROLYN BROWN. In the event of Carolyn Brown's death or disability, Linda Brown shall replace her and all shares shall be voted accordingly.

c. Voting By Directors.

(1) Where there are two or more Directors then serving, any provision requiring a vote of a percentage of Directors shall be interpreted to mean a vote of that percentage of the number of persons then authorized to serve as directors as of the date of the notice of the Directors' meeting when such vote shall occur, or if a written consent shall be executed the date of such consent by the required number of Directors.

(2) All matters to be voted on by the Board of Directors shall be approved, unless explicitly provided to the contrary in another provision of this Agreement, by:

(a) Two-Thirds (2/3rds) of the Directors then serving where the matter is not characterized as a "Major Decision" as defined below.

d. Deadlock of Board of Directors.

In the event that the Board of Directors consists of two or more Directors and is dead-locked, the first person listed in this provision who is able and willing to make a decision to resolve such dead-lock shall do so in Notice to the Board of Directors. Such Notice (as defined below) shall be binding on the Directors and the Corporation:

(1) CAROLYN BROWN
(2) LINDA BROWN
(3) DOUGLAS BROWN
(4) RAYMOND DIETRICH

(a) The above persons, if not already a Director, shall be referred to as the Temporary Directors. If an event occurs which triggers the appointment of a Temporary Director, as defined below, and shall, so long as employed by the Corporation assume responsibility of daily business affairs of the Corporation.

(b) In the event of the disability of the Principal Shareholder, or any legal requirement to appoint additional Directors, the Designee of the Principal Shareholder (and if required more than one of such persons) shall serve as a Temporary Director.

e. Compensation of Directors. No person shall receive compensation for serving as the Director.

2. Officers.

a. Officers to Be Designated by Board of Directors.

The Board of Directors shall elect the Officers of the Corporation and the Director(s) of the Subsidiary.

b. Compensation of Officers.

Compensation of Officers shall be determined by the Board of Directors. The compensation of officers and employees of the Subsidiary shall be determined by its Board of Directors.

3. Immediate Resignation if Officer or Director Terminated.

In the event of the termination of the Employment or Share ownership of any Minority Shareholder, for any reason whatsoever, such termination shall immediately result in the automatic resignation of such Minority Shareholder as an Officer and Director of the Subsidiary and the Corporation and the Minority Shareholders designate the Corporation as Agent to effect same as provided under the provision below "Appointment of Corporation as Attorney In Fact To Facilitate Termination of Shareholder".

4. Management.

The daily business operations of the Corporation shall be managed by the Officers of the Corporation under the direction of the Board of Directors. In the event of a disagreement among the Officers concerning the daily business operations of the Corporation, the decision of the Board of Directors shall control.

5. Control.

a. Daily Management Decisions.

The overall management and control of the business and affairs of the Corporation, which cannot be changed by an action of the Board of Directors, and excluding the daily operating decisions provided for above, shall be vested in the Directors.

b. Major Decisions.

Major decisions, enumerated below, shall require the majority approval of the Shareholders ("Major Decisions"). The Major Decisions shall include:

Major decisions, enumerated below, shall require the majority approval of all of the Shareholders who are not then disabled or deceased, and the affirmative vote of Three Fourths (3/4ths) of the Board of Directors ("Major Decisions"). The Major Decisions shall include:

(1) Acquisition, sale, exchange, disposition, or creation of a business other than the Business.

(2) Sale, exchange or disposition of the Business or the Corporation, or Subsidiary.

(3) Incurring any debt other than:

(a) Trade accounts payable.

(b) Other debts incurred in the ordinary course of the Business.

(c) To guarantee any debt or other obligation, where the amount involved exceeds Fifty Thousand Dollars ($50,000.00).

(4) Waiver or modification of the provisions governing non-competition of a Shareholder who is an employee.

(5) Increase in the number of Directors.

(6) Dilution of the interests or rights of the Shares.

(7) Changing any other provision of this Agreement.

6. <u>Conduct of Business.</u>

a. <u>Implementation of Major Decisions; General Conduct.</u>

The Shareholders shall, at the expense of and on behalf of the Corporation, implement or cause to be implemented all Major Decisions approved unanimously by the Shareholders. The Employees and Officers shall conduct, or cause to be conducted, the ordinary and usual Business and affairs of the Corporation in accordance with, and as limited by, this Agreement, and the Shareholders shall, to the extent necessary, cooperate with same.

b. <u>Name of the Corporation.</u>

(1) The Business of the Subsidiary shall only be conducted under the name of "BROWN'S HEATING & COOLING, INC." (the "Name"). The Name of the Corporation and any alternate name of its Subsidiary shall remain the property of the Principal Shareholder and shall continue until it is changed by the Principal Shareholder with the consent of the Board of Directors.

(2)  In the event of the demise of the Principal Shareholder, the Name of the Corporation shall continue unchanged unless the Principal Shareholder's executor votes the Principal Shareholder's Shares to change the Name.

7.  <u>Limitation on Authority</u>.

Except as otherwise expressly and specifically provided in this Agreement:

8.  <u>Authority</u>.

No Party shall have any authority to act for, or assume any obligations or responsibility on behalf of, any other Shareholder or the Corporation.

9.  <u>No Agent</u>.

Nothing herein shall be construed to authorize any Party to act as general agent for any other Party or for the Corporation, or to permit any Party to bid for or to undertake any contract for any other Party, except as otherwise expressly provided for herein and in furtherance of the Business of the Corporation.

10.  <u>Banking</u>.

a.  <u>No Borrowing</u>.  No Shareholder shall have the right to borrow money on behalf of any other Party or the Corporation, or to use the credit of any other Party or the Corporation, for any purpose, except as specifically set forth in this Agreement and for the advancement of the Business.  The Shareholders agree that Patterson Avenue Property, LLC, in which Carolyn and Raymond are Members, may be used as collateral for the Subsidiary.

b.  <u>Separate Bank Accounts</u>.  All funds of the Corporation shall be maintained in a bank account or accounts and no funds of the Corporation shall be commingled with funds or accounts of any Shareholder or person related to any Shareholder.

c.  <u>Guarantees and Cooperation</u>.  Each Shareholder agrees to provide financial information, copies of personal income tax returns, personal guarantees on bank loans to the Corporation, its subsidiary or any commonly owned real estate entity.

## III.    Expenses, Reimbursements, Salaries and Fees of Officers and Directors.

1.  <u>Expenses Generally</u>.

The Corporation shall pay or reimburse reasonable out-of-pocket expenses incurred by any Director or Officer in such person's capacity as an Officer or Director. Reimbursement shall only be made where the expense is a reasonable, necessary and ordinary expense of the Corporation, incurred in the furtherance of the Corporation's Business and which is substantiated in accordance

with the rules and regulations promulgated under Section 162 and 274 of the Internal Revenue Code of 1986, as amended ("Code").

a.  In addition to the preceding paragraph, the Corporation shall provide the Principal Shareholder, in furtherance of the Corporation's Business, with one or more cellular telephones and an automobile selected, from time to time, by the Principal Shareholder.

b.  Reimbursement by the Corporation of the any Shareholder's ordinary, necessary and reasonable substantiated business expenses shall be consistent with prior years' practices and amounts.

2.  Payments to Related Parties.

a.  The Corporation may deal and contract with affiliated or related persons to provide services or materials for the Corporation, provided that such services or products, are specifically described and accounted for, and the fees to be paid therefor and the terms and conditions thereof are not less favorable to the Corporation than those which could be reasonably obtained by the Corporation from equally qualified but unaffiliated third parties.

b.  The Parties hereby agree that the Corporation or the Subsidiary shall pay an annual license fee to the Principal Shareholder for the annual license of the alternate name used by the Corporation as listed on Exhibit **B**, which shall remain the property of the Principal Shareholder.

c.  The Parties further agree to the payment of a monthly rental, inclusive of taxes, insurance, maintenance, and any other customary expenses, for the building located at 88 Birch Street, Little Silver, New Jersey.

d.  For these purposes, persons treated as related to the Corporation shall include but not be limited to, Shareholders of the Corporation owning, directly or indirectly, more than 50% in value of the outstanding stock of the Corporation; family members (brother, sister, spouse, ancestor or lineal descendant) of a more than 50% in value Shareholder; another corporation, if a Shareholder owning more than 50% in value of the Corporation's outstanding stock also owns more than 50% in value of this other Corporation's outstanding stock; a partnership, if a Shareholder owning more than 50% in value of the Corporation's outstanding stock also owns more than 50% of the capital interests or profits interest in the partnership. In determining stock ownership, (a) stock owned by a corporation, partnership, estate or trust is considered owned proportionately by its shareholders, partners or beneficiaries; (b) an individual is considered to own stock owned by his family, as defined above; and (c) stock held by an individual's partner is considered owned by such individual if such individual also owns stock in the corporation.

3.  Directors Fees.

No compensation of any nature shall be paid to any person serving as a Director of the Corporation.

    4. <u>Relationship with Employment Provisions</u>.

Should any person who serves as an Officer or Director of the Corporation also be an Employee of the Corporation, no provision in this provision shall be applied to permit any duplicate payment for the same expense. Nor shall any provision in this provision be interpreted to expand the scope of any compensation or expense reimbursement provision of such other employment arrangement. Where any person is subject to a written employment agreement with the Corporation, the provisions of such written agreement (whether such agreement is part of this Agreement or a separate agreement) shall control.

**IV.**    **<u>Employment Provisions</u>.**

    1. <u>Persons Hired as Employees</u>.

The Corporation shall have officers but need not have employees.  The President of the Subsidiary shall determine the persons to be employed by the Subsidiary.

    2. <u>Services</u>.

      a. <u>Services to be Performed</u>.

In consideration for the remuneration specified in this Agreement, the Minority Shareholder agrees to:

    (1)  Work

    (2)  Adhere to all applicable codes of conduct and professional ethics.

    (3)  Perform services in a professional and dignified manner.

    (4)  Keep an accurate record of all time spent on customer matters and affairs. Such records shall be submitted to the Subsidiary as the Corporation requires together with any special billing instructions that apply to any matters.

    (5)  All customer billings shall be made by the Subsidiary and the Corporation shall have the exclusive authority to fix the fees to be charged to all clients.

    (6)  All fees, compensation and other moneys or things of value received or realized as a result of services provided by the Minority Shareholders shall be strictly accounted for upon demand and turned over to the Corporation upon receipt thereof. This includes

all legal income generated by each Minority Shareholder.

(7) To maintain and prepare reports and documents and underlying work papers, files, and other documentation reasonably appropriate to support the actions taken with respect to any file and to track and meet any deadlines and due dates (collectively the "Papers"). The title to and ownership of the Papers shall be vested solely in the Corporation.

(8) To adhere to rules of conduct and requirements contained from time to time in any personnel manual which applies to all employees or Shareholders generally.

b. Evaluation of Services Performed.

The Minority Shareholder agrees that his performance for the Subsidiary shall be evaluated in the sole discretion of the Principal Shareholder, and shall be based on any factors which the Principal Shareholder deems relevant, including, but not limited to the following:

(1) Fees generated and collected.

(2) Assistance in administration of the Corporation when requested and/or necessary.

(3) Accounts receivable generated and collected.

(4) Efforts and success in controlling Corporation overhead and costs.

(5) Management of personnel reporting to the Minority Shareholder.

3. Compensation of Employees.

a. The compensation of the Employees shall be as determined by the President as follows:

b. Each Employee shall be covered by the Subsidiary's medical, health and similar benefit plans provided by the Corporation on unanimous approval of the Board of Directors. The current practice of having employee's contribute to their medical coverage shall not be changed by this Agreement. All matters of eligibility for coverage or benefits under any health insurance provided by the Corporation shall be determined, in addition to rules established from time to time by the Board of Directors, in accordance with the provision of the insurance policies. The Corporation shall not be liable to any Shareholders, their heirs, family, executors, or beneficiaries, for any payment payable or claimed to be payable under any plan of insurance. The Board of Directors reserves the right to change carriers, plans, eligibility criteria, employee reimbursement coverage, and other aspects of such plans.

c. Unanimous consent of all Shareholders shall be required to increase the

salaries paid to any Employee to an amount in excess of the amounts provided herein.

d. The Corporation has a 401(k) Plan that is administered by TRUSTEE through automatic data processing payroll deductions. Participation in the plan is open to the Shareholders but not required. The Parties acknowledge that the Board of Directors has the authority to change or terminate such plan, or to impose a similar or replacement plan.

4. Vacation.

a. Each Employee is entitled to vacation each calendar year in accordance with the current plan of the Subsidiary.

b. Each Employee shall give the Subsidiary reasonable advanced written Notice of their intended vacation periods and shall give reasonable consideration to the needs of the Subsidiary in planning such vacation periods.

c. Religious holidays, where an employee's religious observance makes employment impermissible, as well as days designated by the Subsidiary as Subsidiary holidays, shall not count in the determination of the above. Such religious observances shall not be inconsistent with past practices.

5. Time Employee Must Devote to Employment Duties.

The Employees must devote substantially all of their business and work time and effort to the fulfillment of the provisions of the employment arrangement contained herein.

6. Restrictions.

In order to induce the other Parties to enter into this Agreement, the Parties agree that where a Shareholder is terminated for any reason he shall not compete with the Corporation in accordance with the terms of the Section "Covenant Not To Compete" and "Confidential Information" (collectively, the "Restrictions") in this Agreement.

7. Termination of Employment.

a. Death of Employee.

(1) The employment of any Employee shall be terminated on the death of the Employee.

(2) In the event of the death of any Shareholder, such deceased Shareholder's estate shall be paid any salary which would have been due for the remainder of the calendar month in which death occurred, and no salary shall be paid thereafter.

(3) Upon the death of any Shareholder such deceased Shareholder's Shares shall be repurchased by the Corporation as provided below. If the Corporation does not exercise the right to repurchase such Shares within Sixty (60) days of the date of such Shareholder's death, then the other Shareholders shall purchase, and the estate of the deceased Shareholder shall sell, all such deceased Shareholder's Shares as provided in the Share transfer provisions below. If more than one Shareholder is deceased, this provision shall be applied so that the first to die Shareholder's Shares shall be repurchased first and then this provision shall be applied after the termination of such first to die Shareholder's interests.

(4) Any Shares owned by a deceased Shareholder shall immediately become non-voting Shares upon death and shall be bequeathed to a trust for the benefit of the issue of such deceased Shareholder or Employee where the surviving voting Shareholders shall serve as One (1) of Two (2) Co-Trustees. Each Shareholder agrees to conform such Shareholder's will and other relevant estate planning documents to accomplish this objective. If there is no surviving issue, or if the Shareholder fails to conform such Shareholder's will or other relevant estate planning documents to reflect this arrangement, then upon death such Shares shall be repurchased by the Corporation and the remaining Shareholders as provided in the Share transfer provisions below.

b.  Disability of an Employee.

Where a Minority Shareholder is an Employee and is Disabled (as defined below) such Employee shall:

(1) Be terminated as an Officer, Director and Employee.

(2) Shall sell to the Corporation all of such person's Shares in the Corporation for their Stated Value.

(3) Shall have all of their Shares in the Corporation converted effective as of the date of such Disability to non-voting Shares.

c.  Termination For Cause.

If an Employee is terminated for cause, any Shares owned by such Employee shall be purchased by the Corporation and the remaining Shareholders as provided below.

The Corporation may terminate any Employee for cause, and after providing Seven (7) days advance Notice of the reasons constituting cause. Cause shall be defined to include:

(1) Willful misconduct in the performance of the required duties so as to cause material harm to the Corporation or Business;

(2) Commission of a material fraud, misappropriation or embezzlement, of Corporate funds;

(3) Gross negligence resulting in a substantial harm to the Corporation or the Business;

(4) Misconduct after reasonable Notice from the Board of Directors to refrain from the misconduct specifically set forth in such Notice; or

(5) Material theft of Corporate assets.

(6) Action that injures the standing of the Corporation or Subsidiary, if such action continues after Notice has been given by the Board of Directors.

(7) Insolvency, bankruptcy, or assignment of assets for the benefit of creditors.

(8) Conviction of a felony or greater crime.

(9) Violation of a material term of this Agreement to provide services to this Corporation without a conflict of interest with other employment.

(10) Failure or refusal to comply with the policies, standards and regulations of the Corporation reasonably established from time to time and for which such Shareholder has received Notice.

(11) Fraud, dishonesty, or other misconduct in the performance of services on behalf of the Corporation.

(12) Failure to faithfully or diligently perform the provisions of this Agreement or the usual and customary duties of such Shareholder's Employment.

8. <u>Disability Provisions</u>.

a. <u>Definition of Disability</u>.

(1) An Employee shall be deemed disabled if such Employee's condition meets the definition of any disability insurance policy purchased on such Employee's life by the Corporation, or a disability insurance policy purchased by the Shareholders individually which are designated as controlling the definition of disability in minutes of the Corporation or in a writing executed by the Shareholders. If no such disability insurance policy is purchased or designated, then the provisions following shall govern.

(2) An Employee shall be deemed disabled if (a) he and the Corporations agree that he is disabled, or (b) for a period of 180 days, he is unable, as a result of any illness, ailment or accident, to effectively discharge his duties hereunder. If the Employee shall

become disabled, the Corporation may, upon notice to the Employee, terminate the Employee's employment and the obligation to pay the Employee's compensation hereunder.

(3) Where an Employee is unable to work for at least 20-hours per week he shall be considered to have failed to discharge his duties. The Employee shall exhaust his vacation, sick and personal days, if any, in any period where he is unable to work for at least 20 hours per week.

(4) In the event of a Disability, the Corporation may give the Employee written notice that he is deemed Disabled. If such Employee has not substantially resumed his duties within five days, then such persons shall be terminated at such time.

(5) Where any Employee is substantially disabled (defined as being unable to work at least Seventy Five percent (75%) of his normal work week for any medical reason) (the "Disabled Employee"), the following provisions shall apply:

(a) Through the sixth (6th) month anniversary date of the disability date, such Employee shall receive his regular salary payable as provided under this Agreement.

9. <u>Consequences To Employee of Firing For Cause</u>.

Where an Employee is fired for cause, the following provisions shall apply:

a. The decision as to whether there is cause shall be determined by an affirmative finding of cause by the members of the Board of Directors and the first person on the list set forth in the provision above governing a deadlock of the Board of Directors.

b. In order to induce the other Parties to enter into this Agreement, the Parties agree that where a Shareholder is terminated for cause such Shareholder shall not compete with the Corporation or Subsidiary in accordance with the terms of the provision "Covenant Not To Compete" in this Agreement.

c. The Corporation must pay such fired Employee the following amounts:

(1) There shall be no severance pay paid by the employer.

(2) The percentage of Stated Value equivalent to the ownership interest in full payment of any stock such person owns in the Corporation, payable over **four** years, in quarterly installments beginning on the first day of the first full month following the month of such firing. If a person fired for cause violates the non-compete provisions contained in this Agreement, and such violation is determined by a Court having proper jurisdiction, in addition to any other remedies, the purchaser of such Shares under this provision may cease making payments under this provision. Such payment shall be first reduced by the repayment of loans to the

Shareholder from the Corporation, Subsidiary or purchasing Shareholders. Any balance that remains outstanding after being credited as provided in the preceding sentence, shall be paid over quarterly over four years at the interest rate provided for similar payments under §1274.

10. Reduction in Buy-Out For Violation of Restrictions.

If any former Shareholder whose Shares were sold to the Corporation or other Shareholders pursuant to this Agreement is being paid on incremental basis and is discovered to violate Restrictions the amount which such Shareholder shall be entitled to shall be reduced to the lesser of that Shareholder's actual cost for such Shares or the Stated Value, calculated as of date of such former Shareholder's termination as a Shareholder, which value shall be deemed to be inclusive of all goodwill. All payments made to such former Shareholder shall be deemed payments on account of such amount.

If payments exceed such amount than the former Shareholder shall refund the differences within Thirty (30) days. Should former Shareholder owe money to the Corporation, Subsidiary or Shareholder, such amount shall become immediately due and payable.

11. Non-Disclosure Provisions Applicable To Employee.

The Employees (and the Shareholders) agree that (a) all research records, technical data, processes, and the like, records of transactions, suppliers, customers, and other information concerning the business of Corporation, whether prepared by Employee or coming into his possession during his employment hereunder (collectively the "Data"), are confidential, and shall at all times remain the property of Corporation, (b) during the course of his employment hereunder and thereafter, he shall not use or divulge any of the Data or any other confidential information concerning Corporation to any person unless he first obtains written permission from the President of Corporation to do so. If employment of Employee terminates, the Data and all copies of all records and other documents embodying the Data shall be left with Corporation as part of its property.

12. Covenant Not To Compete Applicable To Employee.

The provisions concerning covenant not to compete applicable to the Shareholders, below, shall also apply to each employee referred to herein.

The Employees and the Shareholders acknowledges that the business of Corporation extends throughout Monmouth County, New Jersey, and into northern Ocean County, New Jersey. In order to induce the Shareholders and the Corporation to enter into this Agreement, Employee agrees that, during the term of this Agreement, any extensions thereof, and for a period of One (1) year thereafter, he shall not, directly or indirectly, in any capacity, engage or otherwise solicit any of the customers of Corporation, or any of the Shareholders or employees of Corporation, in any endeavor, nor work in a any capacity (whether as an officer, director, employee, vendor or consultant) for a firm whose products and services compete with the

Corporation.

13. Additional Remedy For Breach of Above Provisions.

The Employees and the Shareholders acknowledges that the remedy at law for breach of provisions concerning Non-Disclosure and Non-Competition will be inadequate and, therefore, in the event of any threatened or actual breach of any such provision, in addition to any other remedies that it may have at law or in equity, Corporation shall be entitled to injunctive or other equitable relief.

V. **Allocation of Profits, Distributions, etc.**

1. S Corporation Profits Distributed in Proportion to Share Ownership.

The Corporation and Subsidiary have not, for income tax purposes, elected "S" corporation status or Qualified Subchapter Subsidiary status, respectively. In the event such elections are made, the provisions dealing with S corporation and QSSS issues shall apply.

All profits after reimbursement of business expenses and payment of any salaries provided for herein, or permitted under the terms of this Agreement, shall be divided in accordance with the relative Share ownership of each Shareholder.

VI. **Shareholder Loans.**

1. Existing Shareholders Loans To Corporation.

LENDING SHAREHOLDER has advanced certain funds to the Corporation to fund operations. The Corporation shall repay to such person the amount of such advances.

2. Voluntary Loans From Shareholder To Corporation.

a. Notice; Amount; Due Date of Shareholder Voluntary Loans.

(1) Where the Board of Directors determines that it is reasonably necessary, appropriate or advantageous for a Shareholder to advance funds to the Corporation, then Notice shall be given to all Shareholders of the amount to be so advanced.

(2) The Shareholders shall advise the Corporation of what amount, up to the maximum loan amount contained in such Notice, that each Shareholder wishes to loan to the Corporation. If the Shareholders collective indicate the willingness to loan more than then maximum loan amount then the amount each Shareholder shall loan shall be the amount such Notice indicated should be loaned multiplied by the following fraction [The amount such Shareholder indicated to be loaned/The aggregate amount all Shareholders indicated that they would loan]. This shall be referred to as a "Voluntary Loan".

b.  <u>Interest Rate and other Terms of Shareholder Voluntary Loans</u>.

(1)  The Corporation shall pay interest to the Paid-Up Shareholder who advanced such funds at the rate of One Percent (1%) in excess of the interest rate incurred by the Corporation or Paid-Up Shareholder in funding such Deficit Amount, or if no such rate can be established, then at the interest rate determined under Code Section 1274(d), applying the federal mid-term rate, as of the date nearest following the date of the transaction on which interest is to be charged, plus Four Percent (4%) (the "Rate").

(2)  Interest shall be payable annually on such Mandatory Loan, such loan shall be evidenced by a written note, and shall have a maturity of not more than Three (3) years.

c.  <u>No Objection to Voluntary Loan</u>.

If any Shareholder:

(1)  Fails to reply to the above Notice within Fifteen (15) business days from the date such Notice was received or effective;

(2)  Executes a unanimous consent of all Shareholders and/or Directors approving such Voluntary Loan; or

(3)  Does not object to such loan following the later of: Two (2) periodic interest and/or principal repayments; or the Sixth (6th) month anniversary date of the date on which Corporation received such Voluntary Loan funds

then such Shareholder cannot object to such Voluntary Loan.

3.  <u>Obligation to Loan or Guarantee Funds</u>.

The Shareholders shall be obligated to advance any loans to the Corporation or Subsidiary and to guarantee any funds borrowed by the Corporation or Subsidiary.

4.  <u>Shareholder Loans From the Corporation</u>.

The Corporation may advance any funds to any Shareholder, officer or Employee, unless there is unanimous consent of the entire Board of Directors and all Shareholders to such loan.

**VII.**  **<u>Voting Trust</u>.**

Until such time as restrictions on all shares issued through the Plan are released or lapse,

such issued shares and shares remaining in the Plan shall be voted by Carolyn Brown, her agent, trustee or personal representative.

## VIII.  **Share Transfers**.

If, for any reason, any party hereto or his personal representative should desire to dispose of any of his Shares in the Corporation, such party shall do so only in accordance with the provisions of this provision.

1. Stated Value Closing.

a.  Stated Value Purchase Price.

(1) The Purchase Price for any Shares of the Corporation for a Stated Value Closing under this provision shall be the Stated Value.

(2) The Stated Value applicable to any particular Shareholder shall be determined as follows:

| Stated Value | x | Number of Shares owned | = | Purchase Price |
|---|---|---|---|---|
| Total number Shares | | by the particular Shareholder | | |

b.  Determination of the Stated Value.

The Stated Value of the Shares in aggregate shall be determined as follows:

(1)  The Parties agree that the Stated Value of all of the issued and outstanding Shares at the execution date of this Agreement is the value set forth in "Exhibit A: Certificate of Stated Value", attached.

(2)  On or before November 15 of each year hereafter, the Shareholders shall agree upon an updated Stated Value of the Shares, which updated Stated Value shall be set forth in either a certificate or minutes of the Corporation executed by each of the Shareholders and the Trustee of the Voting Trust where shares in Trust shall be subject to and governed by such figure, and annexed hereto or maintained in the minute book or other permanent records of the Corporation. Such updated Stated Value shall be deemed to include the value of any goodwill of the Corporation as a going concern.

(3) In the event that the Shareholders have failed for a period of Eighteen (18) months prior to the date of the death or disability buy-out of any Shareholder, the Stated Value last determined shall be increased by the increase in the Net Book Value, determined in accordance with the Corporation's regular method of maintaining its books and records, as of the last calendar quarter preceding the determination of such Stated Value to the Net Book Value as of the calendar quarter preceding the death or disability triggering the buy-out hereunder.

2.  <u>Shares of Deceased Shareholder</u>.

a.  <u>Required Transfer of Deceased Shareholder's Shares</u>.

If all of the Corporation's Shares owned by any Shareholder at the time of death or Final Disability have not been sold or transferred to the Corporation pursuant to the preceding provisions of this Agreement then the if the Corporation does not exercise such right, then each Shareholder shall be jointly and severally personally obligated to purchase the entire interest of the deceased Shareholder, or the Shareholder under Final Disability, in the Corporation. The purchase shall be in accordance with the provisions hereinbelow, and within the earliest of the following time periods such Shares shall be transferred as provided in this provision:

(1)  One Hundred Eighty (180) days after the qualification of a Shareholder's personal representative.

(2)  At the election of such personal representative after qualification.

(3)  Ten (10) days prior to the dates set forth in Section 1361(c)(2) in order to avoid a disqualification of the Corporations election of S corporation status; then such personal representative shall sell to the Corporation, and the Corporation shall purchase from such personal representative, the unsold Shares at a price equal to their fair market value as of the end of the calendar month in which death occurs.

(4)  Sixty (60) days following the Final Disability of the Shareholder.

b.  <u>Guarantee</u>.

The Corporation and the remaining Shareholders shall personally guarantee the payments to the estate of the deceased Shareholder if the Purchase Price is less any loans to the Corporation owed by selling Shareholder.

c.  <u>Earlier Payment of Balance Due</u>.

The Corporation shall have the right to prepay the balance of the purchase price at any time in whole or in part without premium, but together with interest on the amount prepaid to the date of each prepayment (each prepayment to be applied to unpaid installments in the inverse order of their maturities).  The unpaid balance of the purchase price shall be subject to acceleration on notice to the Corporation by such personal representative (i) for default by the Corporation in any payment of principal or interest continuing beyond a grace period of Thirty (30) days, or (ii) in the event the Corporation is adjudicated bankrupt or insolvent.

d. <u>Restrictions On Corporation Pending Repayment</u>.

Until the Corporation has paid the balance in full, the Corporation shall not (i) enter into an agreement of merger or consolidation or for the sale of substantially all of its assets or Business, unless the purchaser of its assets and business confirms or agrees in writing that it is bound by the obligation to pay the balance; (ii) declare or pay any stock or other dividends on it stock in a manner inconsistent with prior practices and policies, or (iii) increase the compensation of its executives in a manner inconsistent with prior practices and policies.

3. <u>Application of Share Transfer Provisions</u>.

a. <u>Limitations On Right To Purchase</u>.

A right to purchase Shares pursuant to this provision may be transferred or assigned only to or for the benefit of a person who shall at that time be an owner of Shares in the Corporation and a Party to this Agreement.

b. <u>Ineffectiveness of Improper Share Transfer</u>.

No purported sale, assignment, creation of a security interest in or lien upon, gift of, trust (other than a QSST trust or other Trust, as permitted above, for the benefit of his immediate family) of, or other disposition of any of the Shares of the Corporation by any Shareholder in violation of the provisions of this Agreement, the Certificate of Incorporation or the By-laws shall be valid, and the Corporation shall not transfer any of such Shares on the books of the Corporation nor shall any of said Shares be entitled to vote, nor shall any dividends be paid thereon, during the period of any such violation. Such disqualifications shall be in addition to and not in lieu of, any other remedies legal or equitable to enforce the foregoing provisions.

c. <u>No Sale or Transfer of Shares</u>.

Except as herein provided, no Shareholder shall sell, assign, create a security interest in or lien upon, give, place in trust (other than a QSST trust, or other trust, as permitted above) for the benefit of his immediate family) or otherwise dispose of all or any portion of such Shareholder's Shares in the Corporation now owned or hereafter acquired.

d. <u>Stock Legend</u>.

Each certificate representing the Shares of the Corporation shall bear the following legend which shall be noted conspicuously thereon:

"This certificate is subject to transfer restrictions and may only be transferred in accordance

> with the terms of a Shareholders' Agreement, a copy of which is in the Corporation's office."

No Shares of the Corporation shall be deemed properly issued, and no Shares shall be transferred upon the books of the Corporation, nor shall any dividends be paid thereon, nor shall the holder thereof be entitled to any voting or other rights of a Shareholder unless the certificate evidencing such Shares contains said legend.

### e. No Waiver As To Future Transfers.

Failure of the Corporation, or of the Shareholders, to exercise any option to purchase given under this Agreement, and any waiver of any rights hereunder as to any transfer, shall not, as to any future transfers of said Shares (either voluntary or by operation of law) discharge such Shares from any of the restrictions contained herein.

### f. General Closing; Payment Terms.

The following provisions shall govern the Closing of any transfer of Shares of the Corporation except where, and to the extent, that the preceding provisions which apply to such transfer provide otherwise:

### (1) Date and Time of Closing.

#### (a) Date and Time at Discretion of Board of Directors.

The Closing pursuant of any transfer of Shares shall take place at the office of the Corporation, and at a date and time in accordance with the requirements of the applicable transfer provision above, if any, in the reasonable discretion of Two-Thirds of the Board of Directors.

### (2) Down Payment; Minimum Payment.

Simultaneously with the delivery of the Shares subject to transfer, the Corporation shall deliver to such Shareholder, or such Shareholder's representative, a certified or bank check to the order of the Shareholder or the estate of the deceased Shareholder if applicable, in an amount equal to the lesser of: (i) Twenty Five Percent (25%) of the Purchase Price of the Shares being purchased; (ii) or FIFTY THOUSAND Dollars ($50,000). The Corporation or Shareholders purchasing such Shares shall pay the balance of the Purchase Price in equal quarterly installments over the following period:

(a) In the event of the Final disability of a Shareholder, a Five (5) year period.

(b) In the event of the death of a Shareholder, a Seven (7)

year period. Such period shall commence on the first business day of the first full calendar Quarter beginning after the date on which the Closing takes place. No such installment shall be less than Two Thousand Dollars ($2,000).

(3)    Installment Notes Evidencing Purchase Price in Excess of Down Payment.

(a)    The Corporation and/or the purchasing Shareholders, as the case may be, shall execute notes evidencing such obligations, with the Shares being purchased, and the guarantee of the persons executing such notes, being security for the repayment of same (the "Installment Notes"). Installments shall be payable by the Corporation or purchasing Shareholder, as the case may be, with interest on the unpaid balance at the Federal Mid-term rate in effect at the date of such Closing, as determined under Code Section 1274(d) and the announcements and regulations thereunder (the "Rate").

(b)    The Corporation, or the purchasing Shareholders, as the case may be, shall have the right to prepay the balance of the Purchase Price at any time in whole or in part without premium, but together with interest on the amount prepaid to the date of each prepayment (each prepayment to be applied to unpaid installments in the inverse order of their maturities). The unpaid balance of the Purchase Price shall be subject to acceleration on notice to the Corporation or purchasing Shareholder by the transferor Shareholder or such transferor Shareholder's representative: (i) For default by the Corporation or purchasing Shareholder in any payment of principal or interest continuing beyond Notice and a grace period of Thirty (30) days (not more than Two (2) grace periods during the period of any such deferred payment); or (ii) In the event the Corporation is adjudicated bankrupt or insolvent.

(4)    Transfer of Title to Shares at Closing.

(a)    During the period of such Installment Notes being paid, the transferor Shareholder's Shares shall be held in escrow by the attorney for the transferor Shareholder, or the Accountant if both the transferor Shareholder (or such Shareholder's representative) and the purchasing Shareholder agree ("Escrow Agent") until all payments of the Purchase Price (inclusive of interest) have been made. The purchasing Shareholder shall have the right to vote the Shares, so long as the purchasing Shareholder is not in default. However, if the Corporation is the purchaser of the Shares, they shall be non-voting. All dividends payable on such Shares shall be paid to the escrow and applied to the Purchase Price.

(b)    At the Closing, certificates representing the Shares of the Shareholder being purchased, duly endorsed for transfer or accompanied by duly executed stock powers (together with all requisite transfer tax stamps), shall be delivered by the transferor Shareholder to the Corporation, or the purchasing Shareholder as the case may be, together with the transferor Shareholder or such transferor Shareholder's representative's, warranty that the transferor Shareholder had, and the Corporation or purchasing Shareholders by virtue of the transfer of the Shares of the transferor Shareholder shall obtain, good and marketable title to such

Shares free and clear of any claims, liens and encumbrances. Upon receipt of such Shares the Corporation shall cancel such Shares (and if applicable re-issue new Share certificates to the purchasing Shareholders) and the transferor Shareholder shall have no further rights or interests in the Corporation other than to the payment of the Purchase Price as provided for in this Agreement. Simultaneously with such delivery, the Corporation, or the purchasing Shareholders as the case may be, shall deliver to the transferor Shareholder payment for the Shares being purchased, in accordance with the terms of purchase, including the financing provisions and limitations on payments contained in this Agreement.

       (c)    All documents relating to such transfers, notes supporting payments, stock certificates and executed blank stock powers shall be held in escrow by the attorney for the Corporation, pending final payment of the amounts provided for in the Stated Value purchase.

### (5) Life or Disability Buy-Out Insurance.

In the event that either life insurance, or disability buy-out insurance, is purchased specifically to fund such buy-out, then the down payment shall not be less than the proceeds available from such policies. Such insurance held by the Corporation, paid for by the Corporation, or designated in the Corporate minutes as for buy-out shall conclusively be presumed to be for a buy-out. Further, if such insurance proceeds are received, then notwithstanding any other time periods for Closing herein, if such proceeds at least equal Twenty Five Percent (25%) of the Purchase Price, the Closing shall not be later than Thirty (30) days after the receipt of such proceeds.

       (6)    Restrictions on Corporation Pending Payment of Purchase Price.

Where the Corporation is the purchaser of the transferor's Shares, until the Corporation has paid the balance of the Purchase Price in full (including interest), the Corporation shall not: (i) Enter into an agreement of merger or consolidation or for the sale of substantially all of its assets or Business, unless the purchaser of its assets and Business agrees in writing that it shall be bound by the obligation to pay the balance of the Purchase Price without regard to the Cap; (ii) Declare or pay any stock or other dividends on it stock; or (iii) Increase the compensation of its executives who are members of the Board of Directors.

### g. Prerequisites to Share Transfer.

       (1)  Any Shareholder transferring an interest in this Corporation shall be responsible for any costs which the Corporation reasonably incurs in effecting such transfer, including but not limited to legal and accounting fees. However, appraisal fees and costs shall be treated as provided above, if such fees are specifically addressed in a transfer provision applying to the transaction in issue.

(2)  No transfer of any Corporation interest shall be made unless the Corporation has first obtained opinion of counsel that such transfer will not:

(a)  Trigger the acceleration of any material loan to the Corporation.

(b)  Violate the Securities Act of 1933 or the provisions of any state's blue sky statutes.

(c)  Violate S corporation shareholder rules, if then applicable.

(3)  No transfer may be completed until such time as the transferee has become a signatory to this Agreement and bound by its terms.

### 4.  <u>Board of Directors as Agent</u>.

Each Shareholder, upon execution of this Agreement, hereby designates and appoints the President as such Shareholder's agent, and attorney-in-fact or substitute ("Agent"), to act in the name, place and stead of such Shareholder, as if such Shareholder were personally present, with respect to all the matters mentioned herein, including but not limited to full authority to transfer any Shares owned by such Shareholder to the Corporation or other Shareholders as may be required pursuant to any prior transfer provisions of this Agreement. Such transfers may be made to the extent such Shareholder is permitted by law to act through an agent. Such Agent shall have full and unqualified authority to delegate any or all of the powers enumerated herein to any person or persons whom the Board of Directors as attorney-in-fact shall select. Each Shareholder does hereby ratify and confirms all that said Agent does or causes to be done. The powers granted hereunder are irrevocable powers coupled with an interest and shall survive the death, incapacity, bankruptcy or insolvency of each Shareholder.

Each of Shareholder hereby grants to, and directs his agent and executor to, and is deemed to have executed in favor of, the Corporation an irrevocable proxy and durable power of attorney (which each such Shareholder hereby agrees to be coupled with an interest) to sign and file any documents to effectuate this provision, including but not limited to the transfer of such Shareholder's Shares to the Corporation.

### IX.  <u>Covenant Not to Compete/ Confidential Information</u>.

### 1.  <u>Covenant Not To Compete</u>.

Notwithstanding anything herein to the contrary, where any provision of this Agreement shall require that any Party shall sell such Party's Shares, and such sale is in fact consummated (under the Reciprocal Buy/Sell, or otherwise), then the following provisions shall apply to such selling Party and that Party's spouse.

Any Party subject to this covenant not to compete, shall not, for a period of Two (2) years from the date of the applicable triggering event, within Three (3) years of the last date of any payment under a Disability buy-out provision (it being the specific intent of the Parties, and the Parties acknowledge that if income is paid under a disability insurance policy designated for disability buy-out purposes that such payments to age 65 or later would effectively preclude such Party from ever competing with the Corporation) within Five (5) years of the final payment under the Reciprocal Buy/Sell provision above, compete directly or indirectly, in any capacity, engage or otherwise solicit any of the customers of the Business, or conduct during such period any business engaged in the same activities as the Business described herein, or similar competing endeavor, nor work in a similar capacity for a firm whose products compete with the Business. Each Party acknowledges that the Business naturally extends throughout the THIRTY (30) miles of the Corporation's business locations on the date of such event. The Parties are aware of the broad scope, in terms of geography and time, of this subsection, and with full knowledge of this consideration each specifically agrees to the terms of this subsection.

2. <u>Confidential Information</u>.

Each Shareholder agrees that (a) all customer lists, research records, technical data, production sales data and the like, records of transactions, suppliers, customers, and other information concerning the Business (collectively the "Data"), are confidential, and shall at all times remain the property of the Corporation, (b) during the term of this Agreement and for a Two (2) year period thereafter, no Shareholder shall use or divulge any of the Data or any other confidential information concerning the Corporation or the Business to any person unless he first obtains written permission from the Corporation to do so. If any Shareholder ceases to be a Shareholder, the Data and all copies of all records and other documents embodying the Data shall be left with the Corporation as part of its property.

3. <u>Equitable Relief</u>.

Each Party acknowledges that the remedy at law for breach by such Party of the provisions concerning non-disclosure and ownership of assets and data, and non-competition, will be inadequate and, therefore, in the event of any threatened or actual breach of any such provision, in addition to any other remedies that it may have at law or in equity, any Party shall be entitled to injunctive or other equitable relief.

4. <u>Indemnification</u>.

Each party hereto agrees to indemnify and hold harmless the other party hereto for any costs or damages, including reasonable attorney fees, resulting from any breach of any representation, warranty or covenant contained in this Agreement.

## X      **Independent Advice to Counsel.**

Each party hereto has been advised to seek the advise of counsel prior to executing this Agreement. Each party, by executing this Agreement, acknowledges that he has been advised to seek independent counsel and that the execution of this Agreement can affect their legal rights, that reasonable time to consult with independent counsel has been afforded, and that he has consulted with independent counsel, or has of his own volition decided not to do so.

Each Shareholder acknowledges that EVANS, OSBORNE & KREIZMAN, LLC, has represented the Corporation only and has not represented any individual Shareholder, except for Carolyn Brown.   Peter Van Dyke, Esq. and the law firm of Kelaher, Garvey, Ballou, Van Dyke & Rogalski, have represented Raymond Dietrich.

## XI.    Representations and Warranties.

Each party represents, covenants and warrants that:

1. No Default.

Neither the execution and delivery of this Agreement, nor consummation of the transactions provided for in this Agreement, shall result in the breach of, or constitute a default under, any agreement by which he is bound or violate any court order or decree.

2. Authority.

Each Party represents and warrants to the other that neither the execution and delivery of this Agreement by him, nor consummation of the transactions provided for in this Agreement shall result in the breach of, or constitute a default under, any agreement by which he is bound or violate any court order or decree. This Agreement is valid and binding upon, and enforceable against, him in accordance with its terms. No Party is under any constraint prohibiting such party from entering into, being bound by, or carrying out the terms of this Agreement. Any actions necessary to be completed to permit and authorize each party to enter into this Agreement have heretofore been taken and completed.

3. Purchase For Investment and Not To Re-sell.

The Parties severally represent and agree that the Shares being purchased by each of them hereunder shall be acquired for the purpose of investment and not with a view to their sale in connection with any public distribution thereof.  Each agrees not to sell, transfer or otherwise dispose of any of such securities unless such securities are first registered under the Securities Act of 1933, as amended, or unless in the opinion of counsel to the Corporation such registration is not required.

4. Compliance with S Corporation Requirements.

The Parties acknowledge that the Corporation may elect to become an S corporation and that such election will severely limit the persons who are eligible for the transferee of their Shares. Therefore, notwithstanding anything herein to the contrary, the Parties hereby represent, warrant and covenant that they shall not make any transfer of any Share, nor shall they provide for transfer by will, trust or otherwise, to any Shareholder who would not properly qualify as a shareholder of an S corporation.

5. <u>Licenses; etc</u>.

Each Shareholder possess, and shall continue to possess and retain in good standing, any licenses and certifications necessary to consummate the transactions contemplated in this Agreement, and to conduct the Business and perform their obligations hereunder.

6. <u>Additional Representations and Warranties of Selling Shareholders</u>.

a. <u>Existence, Power, Qualification, Etc</u>.

The Corporation is duly organized, validly existing and in good standing under the laws of the State of incorporation, has all requisite authority to own and operate the Business, and is duly qualified and authorized to do business and is in good standing in each jurisdiction in which its Business makes such qualification necessary.

b. <u>Affiliates</u>.

The Corporation does not own interests in, nor is it affiliated with, any other business entity. It does not and has not had any subsidiary.

c. <u>Financial Condition</u>.

Complete copies of an unaudited balance sheet and income statement for the fiscal year ended 2009; and the 2009 tax return for the Corporation and Subsidiary have been made available (collectively the "Financial Statements"). The Financial Statements are substantially correct and complete in all material respects and reasonably represent the financial position of the Corporation as at the dates thereof and the results of its operations for the periods indicated therein. Selling Shareholder's does not have any knowledge, without duty for inquiry, of any material liabilities or obligations, whether accrued, absolute, contingent or otherwise, except as reflected in the Financial Statements.

d. <u>Inventory</u>.

To the best of Selling Shareholders' knowledge, without duty for inquiry, the Corporation's inventory is saleable or usable in the ordinary course of business.

e. <u>Taxes, Returns and Payments</u>.

All income, unemployment and other tax, franchise and similar returns and reports (the "Returns and Reports") for the Corporation required by federal, state and local law have been duly and timely filed and all taxes, assessments and other governmental charges upon the Corporation or upon its properties which are due and payable have been paid. There have been no audits of the Corporation's tax returns and Selling Shareholder is not aware of any imminent or pending audit or any basis for any additional assessments against it. There are no waivers in effect of the applicable statutes of limitations in respect of federal income taxes for any year.

f. Title to Assets.

The Corporation, to the best of Selling Shareholder's knowledge, without duty of inquiry, has good and marketable title to all of its material assets free and clear of all security interests, liens, encumbrances, restrictions and other burdens.

g. Condition of Assets.

The tangible assets of the Corporation are in working order and are reasonably suitable and fit for the purposes for which such assets are being used.

h. Litigation and Claims.

To the best of the Selling Shareholder's knowledge, without duty of inquiry, there are no actions, claims, proceedings or investigations pending, or threatened, against or affecting the Corporation, in any court or arbitration proceeding or before any governmental agency or authority, which if adversely decided, could have a material adverse effect on the Corporation or its business, financial condition or results of operations. To the best of the Selling Shareholder's knowledge without duty of inquiry, the Corporation is not subject to any order, judgment, injunction or decree which could materially and adversely affect its assets, business, financial condition or results of operations.

i. Compliance with Contracts, etc.

To the best of Selling Shareholder's knowledge, without duty of inquiry, the Corporation is not in default under, or in violation of, any provision of any indenture, agreement, deed, contract, lease, license, instrument, order, arbitration award, judgment or decree or other instrument or arrangement to which it, or any of its assets, are subject. Each contract, agreement or arrangement to which Seller is a party is in full force and effect.

j. Insurance.

The insurance presently in effect on the business adequately covers losses or damages in amounts which are reasonable and sufficient. The assets used in the Business are insured for their full insurable values, against loss or damage by fire, theft or other risks, at the standard rates for

similar assets in the area where the Business is conducted.

### k. Books and Records.

To the best of Selling Shareholder's knowledge, without duty of inquiry, the books and records of the Corporation are complete and correct in all material respects, have been maintained in accordance with good business practice and accurately reflect the basis for the financial condition and results of operations set forth in the Financial Statements.

### l. Licenses, Trademarks and Trade Names.

The Corporation owns and has all right, title and interest in all licenses, permits, patents, patent applications, trademarks, service marks, trademark registrations, applications for trademark registrations, trade names, and approvals including but not limited to the alternate name "BROWN'S HEATING & COOLING" (collectively the "Licenses"). To the best of the Selling Shareholder's knowledge, the Licenses are the only licenses, permits, patents, trademarks, service marks, trade names and approvals necessary for the conduct of the Corporation's business.

### m. No Violation of Charter, Laws, Etc.

Neither the execution and delivery of this Agreement, nor the consummation of any of the transactions contemplated herein, will violate, conflict with, or result in a breach of, or default under, any of the provisions of the Corporation's Certificate of Incorporation, By-Laws of Seller, any note, bond, mortgage, indenture, deed of trust, or other material agreement to which the Corporation is subject; any judgment, ruling, order, writ, injunction, decree, statute, ordinance, law, rule or regulation applicable to the Corporation; or any material license, or contract affecting the Corporation's business. No action of, or filing with, any governmental or public body or authority is required to authorize, or is otherwise required in connection with the execution, delivery and performance of this Agreement or any of the instruments to be delivered pursuant hereto.

### n. Bankruptcy.

No action or proceeding in bankruptcy or insolvency has commenced or, to the best of Selling Shareholder's knowledge, without duty of inquiry, been threatened against Selling Shareholder or the Corporation.

### 7. Additional Representations and Warranties of Buying Shareholder.

### a. Power and Authority to Purchase Shares.

This Agreement constitutes, and each instrument to be executed and delivered by Buying Shareholder in accordance herewith, shall constitute a valid and legally binding obligation of

Buying Shareholder, enforceable against them in accordance with their respective terms. Buying Shareholder are not aware of any circumstances which could affect the validity, legality or enforceability of this Agreement. Buying Shareholder has the legal power and authority to execute and deliver this Agreement and to consummate the transactions contemplated herein.

b. Bankruptcy.

No action or proceeding in bankruptcy or insolvency has commenced or, to the best of Buying Shareholder's knowledge, without duty of inquiry, been threatened against Buying Shareholder.

8. Survival of Representations and Warranties.

All the Additional Representations and Warranties of Selling Shareholder and Buying Shareholder set forth above (including the Exhibits relating thereto) shall be true on the execution of this Agreement, but shall not, unless specifically provided to the contrary, survive the execution of this Agreement.

**XII. Accounting, Financial Reporting, and Tax Matters.**

1. Books and Records.

a. The Corporation shall maintain or cause to be maintained complete and accurate books of account and records for the Corporation's Business and for all transactions entered into by the Corporation.

b. The records shall be maintained in accordance with generally accepted accounting principles consistently applied.

c. The records shall be kept at the Corporation's office, and each Shareholder or such Shareholder's representative shall have reasonable access to the records and right to make copies thereof during normal business hours.

2. Income Tax Information.

The Corporation shall make available information on the Corporation's taxable income or loss and each class of income, gain, loss or deduction that is relevant. This information shall be made available as soon as possible after the close of the Corporation's fiscal year, but in no event later than Ninety (90) days thereafter.

3. Fiscal Year.

The Corporation and Subsidiary shall operate on a fiscal year ending on December 31st.

4. Interim Reports.

The  Directors shall cause to be prepared at the Corporation's expense not less frequently than quarterly progress reports for the Corporation. Such reports shall summarize significant events and decisions occurring during the prior quarter ("Reports"). Reports shall be provided to the each Shareholder by the Tenth (10th) day of the second month following the close of any fiscal quarter reflecting activity for the prior month.

## XIII.   S Corporation Status.

1. S Corporation Election.

The Shareholders acknowledge that the Corporation and Subsidiary may, upon advise of its Accountant, elect at some future date to be taxed as an S corporation and continue to maintain such election until the Accountant determines that such election is no longer recommended. During the period such an election is effective, no Shareholder shall make any transfer, which could jeopardize the Corporation's S election. Each Shareholder hereby agrees to indemnify the other Shareholders in the event of any violation of the provisions of this provision. Each Shareholder shall execute any documents and perform any other acts necessary to elect and retain such S corporation status, if and when the Accountant determines that such an election is advantageous. In such event, each Shareholder agrees to consult with his own tax adviser to verify that the provisions of his last will and testament will not result in the transfer of Corporation's stock to an unauthorized person for a prohibited period of time.

2. Disqualifying Payment Saving Provision.

In the event that such an election is made, than should any payment to any Shareholder violate the provisions of Proposed Treasury Regulation Section 1.1361-1(l) so that such payment would, but for the application of this provision, create an unallowed second class of stock, than any such payment shall be characterized as a loan to such Shareholder at the Rate, and shall be repaid in Fifteen (15) equal monthly installments, due on the first day of each month, and beginning on the first day of the first month following such recharacterization.

3. Distributions to Avoid Phantom Income.

In the event that such an election is made, the Board of Directors shall endeavor to distribute, to the extent possible, sufficient cash to meet the potential tax liability a typical Shareholder may face as a result of the Corporation having elected to be taxed as an S corporation. Such distributions shall be made, to the extent possible, within Sixty (60) days of the Corporation's fiscal year end.

## XIV.   Key Person Insurance.

The Corporation or Shareholders may, but need not, purchase key person insurance on the lives of persons to be determined by the Board of Directors.

## XV.    Assignment; Binding Effect.

This Agreement shall be binding upon the parties hereto, and their respective successors, heirs, legal representatives and assigns, and all Shares of the Corporation in the hands of any person whomsoever shall at all times be subject to the provisions of the provisions governing Share transfers and in the event of any transfer of Shares, each and all of the restrictions, conditions, agreements herein contained shall immediately attach to and bind said Shares in the hands of the transferee and all said options and agreements shall again attach to said Shares and bind each successive holder thereof as soon as said person acquires the same.

## XVI.    Term.

This Agreement shall automatically terminate upon the occurrence of any of the following events, at which time all Shareholders shall be notified of said termination in writing by the Secretary of the Corporation:

1. By written agreement of the Shareholders. However, no such agreement shall be effective prior to the earlier of the termination of the Corporation's Business, or the *Second (2nd) anniversary of this Agreement.

2. When the Shareholders (including any donees, legatees or related Shareholders to the Shareholders) cease to own in the aggregate at least Fifty Percent (50%) of the outstanding Shares.

3. Dissolution of the Corporation.

4. Merger or consolidation to which the Corporation is a party and the Shareholders of the Corporation own less than an aggregate of Twenty percent (20%) of the outstanding capital stock of the surviving corporation.

## XVII. Default.

1. Cure Period; Default Rate.

In the event of the occurrence of one or more of the following events of default and any Party's failure to cure the same within Thirty (30) days of receipt of Notice of such default specifying the default with particularity, then the other Parties hereto may declare the balance of any monies owed as provided herein, if any, immediately due and payable or otherwise declare such Party in default under this Agreement (the "Default Date"). If any Party shall institute any

action to enforce the provisions of this Agreement and prevail in such action, then such defaulting Party shall owe the other Parties, in addition to the monies determined to be due under this Agreement, interest from the Default Date at the Rate, plus Four percent (4%) per annum and the other Parties reasonable attorneys' fees and disbursements.

    2. Events of Default.

        a. Any event deemed a default under any other provision of this Agreement.

        b. Failure to make any payment due under this Agreement or the agreements executed pursuant hereto.

        c. Material breach of any material representation, warranty or covenant contained in this Agreement or any agreement executed pursuant hereto or contained in any certificate, financial statement or other statement delivered hereunder.

        d. Entry of an order of a court of competent jurisdiction appointing a trustee, receiver or liquidator if such order shall not be discharged or dismissed within Thirty (30) days after such appointment.

        e. Filing a petition in bankruptcy pursuant to the Federal Bankruptcy Act or any similar law, federal or state, or entry of a decree of a court of competent jurisdiction adjudicating such Party a bankrupt or declaring such Party insolvent, or such Party's making an assignment for the benefit of creditors.

        f. Such Party's creditors filing a petition in bankruptcy against it or pursuant to the Federal Bankruptcy Act or any similar law, federal or state, if such petition shall not be discharged or dismissed within Sixty (60) days after the date on which such petition was filed.

## XVIII. Notice.

    1. Any notices provided herein shall be written and shall be sent via certified mail, return receipt requested, registered mail, by overnight courier, or personal delivery, to the addresses first above listed, or to such other address as is designated in accordance with the terms hereof ("Notice"). Notice shall be effective on the earlier of:

        a. Actual receipt by the recipient of such Notice, or

        b. The Third (3rd) business day after the date such Notice was sent via certified mail, return receipt requested, or by registered mail; upon the first business day after the date such Notice was sent by overnight courier; and upon the first business day, including the date of delivery if such is a business day, when such Notice is personally delivered.

2. In all cases a Notice shall be dispatched postage or costs pre-paid by the sender. However, this shall not effect the effectiveness of such Notice if it is actually received, or delay the effective date of such Notice beyond the date at which it is actually received.

3. A copy of any Notice shall be sent to the following:

a. To the Corporation:

88 Birch Street, Little Silver, New Jersey 07739.

b. A copy of any Notice to CAROLYN BROWN shall be sent to:

1 Channel Drive, Unit 1004, Monmouth Beach, New Jersey 07750;

c. A copy of any Notice to RAYMOND DIETRICH shall be sent to:

1095 Ridge Avenue, Manahawkin, New Jersey 08050.

## XIX. <u>Interpretation; Miscellaneous.</u>

1. <u>Survival Periods</u>.

Any provisions which do not have a specific survival period, shall survive the expiration or termination of this Agreement for a period of One (1) year.

2. <u>Reference To This Agreement</u>.

Reference to this Agreement herein shall include any amendments or renewal thereof. References to the term of this Agreement shall include any renewal thereof.

3. <u>Entire Agreement</u>.

This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter of this Agreement and supersedes any and all previous agreements between the parties, whether written or oral, with respect to such subject matter. All negotiations, representations, warranties and agreements made between the parties are merged herein and the making, execution, and delivery of this Agreement by the Parties has not been induced by any representations, statements, warranties, or agreements that are not expressed fully herein. Neither of the Parties shall be bound by any conditions, definitions, warranties, or representations with respect to the subject matter of this Agreement unless expressly provided in this Agreement. No term or provision of this Agreement may be varied or modified by any prior or subsequent statement, conduct, or act of any of the Parties, provided that hereafter the Parties hereto may amend this Agreement by written instrument specifically referring to, and executed in the same manner as, this Agreement.

4. <u>No Waiver</u>.

The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence subsequently to that term or any other term of this Agreement.  Any waiver must be in writing.

5. <u>Remedies; Enforcement</u>.

The parties to this Agreement, in addition to all other remedies, agreed to above, or allowed by law for its enforcement, expressly consent to the enforcement of its specific performance in any court having jurisdiction.

6. <u>Governing State Law</u>.

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

7. <u>Further Assurances</u>.

a. The parties hereto further agree, for themselves, and on behalf of the Corporation, to take whatever other action shall be necessary to effectuate the purposes and intent of this Agreement, including but not limited to the execution and delivery of any instruments or documents as may be reasonably required.

b. Each individual Shareholder agrees to take any actions necessary to conform his respective will, any trusts, or other relevant instruments, to assure that the intent of this provision of this Agreement shall be implemented. In the event of any conflict between this provision and the provisions above concerning Share Transfer, the provisions of this provision shall control.

8. <u>Captions, etc</u>.

The captions, provision designations and numbers, are inserted for convenience only and shall not affect the interpretation of any provision. The use of any particular gender, or neuter, or the use of singular or plural, shall be interpreted as appropriate to the specific provision involved.

9. <u>Severable Provisions</u>.

Every provision of this Agreement is intended to be severable.  If any term or provision of this Agreement is held to be illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of the Agreement, this Agreement shall be construed in all respects as if such invalid or unenforceable provision or portion thereof were

omitted, and the parties shall in good faith negotiate alternative terms or provisions to effectuate their original intention to the extent lawful and practical.

10. Interpretation; Conflict of Documents.

In the event of any conflict between this Agreement and any agreement contemplated herein, or any schedule or exhibit attached, the provisions of this Agreement shall control.

11. Counterparts.

This Agreement may be executed in one or more counterparts each of which shall be deemed to constitute an original and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party.

**XX.    Arbitration**.

Any dispute under this Agreement shall, upon Notice to the Parties by any Party to this Agreement involved in such dispute, be submitted to binding arbitration, in Monmouth County, New Jersey, in accordance with the rules of the American Arbitration Association.

**IN WITNESS WHEREOF,** the parties hereto have hereunto set their hands and seals the day and year first-above written.

Dated: _____ July 1st, 2010 _____            CORPORATE SEAL:

_____
CAROLYN BROWN, Shareholder

_____
RAYMOND DIETRICH, Shareholder

_____
CAROLYN BROWN, Trustee of Voting Trust

**BROWN'S HEATING & COOLING, INC.**

By: _____
    Carolyn Brown, President

**Exhibit A: Certificate of Stated Value**.

The Shareholders hereby agree and designate, as the Stated Value of each Share of stock of the Corporation, as of the date of this consent, the following figure:

| Class of Stock | Stated Value Per Share | Stated Value for Entire Class |
|---|---|---|
| Common Stock | $ 500.00 per share | $ 500,000.00 |
| | | |
| Total Value of Corporation | | $ 500,000.00 |

Dated: _July 1st_, 2010                           CORPORATE SEAL:

CAROLYN BROWN, Shareholder

RAYMOND DIETRICH, Shareholder

BROWN'S HEATING & COOLING, INC.

By: _____
    CAROLYN BROWN, President

II. Exhibit B: License of Telephone Numbers.

## LICENSE AGREEMENT

AGREEMENT made effective _July    1st,_ 2010, between **CAROLYN BROWN** ("Licensor") and BROWN'S GAS APPLIANCE & FURNACE SERVICE, INC., a New Jersey corporation, with its principal place of business at 88 Birch Street, Little Silver, N.J. 07739 (the "User").

WHEREAS, the User desires to obtain the use of certain telephone numbers and related rights and goodwill now owned solely by Licensor as more fully described in Schedule 1, attached (the "Rights") in connection with a business of operating a heating and cooling business (the above is referred to as the "Business"). User desires to avail itself of such Rights in exchange for certain license fees per year paid by the User to the Licensor (the "Fee"), and other good and valuable consideration;

NOW, THEREFORE, based on the mutual premises set forth below, and upon other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto agree as follows:

A. Grant of License.

Subject to the User's compliance with all the terms and conditions of this Agreement, Licensor grants for the period set forth in the provision below entitled "Term", to the User a license to use the Rights in its Business (the "Grant"). The Grant shall be exclusive for the State of New Jersey where the Business is operated by User (the "Trade Area"). This Grant shall not extend beyond the Trade Area or Term and User shall have no rights whatsoever to use the Grant or Rights beyond the Trade Area.

B. Limitation On Licensor's Liability.

EXCEPT AS SPECIFICALLY PROVIDED HEREIN, LICENSOR MAKES NO WARRANTIES, EXPRESS OR IMPLIED. Licensor warrants only that it has the right to grant this license and shall indemnify User against liabilities, damages and expenses arising out of any breach of this warranty and as a result of its use of any Rights granted herein. Any liability of Licensor herein is contingent on User providing Licensor with prompt Notice (as defined in the Section "Notice", below) of any claim of infringement or otherwise by any third party asserting a claim against User. Licensor further warrants that it will use its best efforts to make the Rights available as provided herein.

C. Limitations on Grant.

User shall only be entitled to the specific rights granted under this License.

D.  Ownership of Rights.

All Rights shall at all times be Licensor's property, subject only to the User's limited rights as expressly provided herein.

E.  License Fee.

The User shall pay to Licensor a License Fee of One Hundred Dollars ($100.00) payable annually (the "Fee") in accordance with this License Agreement.

F.  Assignment.

Assignment of this Agreement or the Rights is prohibited. This Agreement may not be assigned by User and the Rights may not be made available by User to any other person. However, Licensor may assign the Rights to a spouse, child, a limited liability company or partnership owned by Licensor and/or a child and/or spouse, or a trust for the benefit of licensor and/or a child and/or spouse. This restriction shall apply to such transferee so that no further transfer to any person other than set forth herein shall be permitted.

G.  Term.

The term of this Agreement shall commence on the date first above written and shall remain in effect for the lesser of the following periods: (i) so long as User complies with its obligations hereunder; (ii) the cessation of the Business of the User; (iii) the termination or resignation for any reason of Licensor as an Officer, Director, or Shareholder of the User for any reason whatsoever; or (v) the Fifth (5th) anniversary date hereof, unless no notice is issued by either party canceling this License by Ninety (90) days advance Notice, in which event this License shall continue for additional One (1) year terms until cancelled by Ninety (90) days Notice (the "Term").

H.  Construction.

This Agreement expresses the entire understanding between the parties relating to the subject matter hereof and may not be modified, renewed, extended, or discharged, except by an Agreement in writing signed by the party against whom enforcement of the modification, renewal, extension or discharge is sought, or by such party's agent.  This Agreement shall be construed in accordance with the laws of the State of New Jersey and any actions hereunder shall be brought in the New Jersey court system.  Waiver of any breach of this Agreement must be in writing and shall not be deemed a waiver of any preceding or succeeding breach of the same or any other provision.

I. Breach.

Any Party hereto who has been found to have breached any of the representations, covenants or other provisions of this Agreement shall be liable to the non-breaching Party for all damages, including reasonable attorneys fees, interest, reasonable experts fees and costs of suit.

J. Injunction.

User acknowledges that it may be difficult to measure the damages resulting from any breach of this License Agreement and that even if damages would be measurable, a temporary and permanent injunction or other equitable remedy would be an effective and appropriate remedy. User further acknowledges that the restrictions herein are reasonable, are reasonably necessary for the protection of the interests in the Rights, including but not limited to the interests in the goodwill of the Licensor in the Rights and by virtue of the circumstances of the Licensor's interests in the Rights, a violation by the User or any such covenant may cause irreparable damage to the Licensor. Therefore, the User hereby agrees that any breach or threatened breach by him of any provision of this License Agreement shall entitle the Licensor, in addition to any other legal remedies available to it, to apply to any court of competent jurisdiction for a temporary and permanent injunction or any other appropriate decree of specific performance (without any bond or security being required) in order to enjoin such breach or threatened breach.

K. Applicable Law, etc.

This Agreement shall be construed in accordance with the substantive law of New Jersey and any action relative hereto shall be bought in the state court system located in Monmouth County, New Jersey.

L. Notice.

Any notices provided herein shall be sent via certified mail, return receipt requested, registered mail, or personal delivery, to the addresses first above listed, or to such other address as is designated in accordance with the terms hereof ("Notice"). In the case of any Notice, a copy shall be sent to: Evans, Osborne & Kreizman, LLC, 802 W Park Avenue, Suite 222, Ocean, New Jersey 07712.

IN WITNESS WHEREOF, this Agreement has been executed as of the day and year first above written.

SHAREHOLDERS:

_____
CAROLYN  BROWN

_____
RAYMOND  DIETRICH

BROWN'S HEATING & COOLING, INC.

By _____
CAROLYN BROWN, President

SCHEDULE 1

DESCRIPTION OF RIGHTS

a.  The Names "Brown's Heating & Cooling" and any like or similar sounding names.

b.  The telephone numbers: 732-741-0694